IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA S. PALMIERI, | ) |
| Plaintiff, | ) |
| vs. | ) Civil Action No. 05-1198 |
| JO ANNE B. BARNHART,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Barbara S. Palmieri and Defendant Jo Anne B. Barnhart, Commissioner of Social Security.  Plaintiff seeks review of a final decision by the Commissioner denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*[1]  For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

### II.   BACKGROUND

#### A.   Factual Background

Barbara Palmieri worked for several years as a bookkeeper

---

[1] To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured.  42 U.S.C. § 423(a).

and administrative secretary until she was laid off from her secretarial position with the University of Pittsburgh in November 2002.  She had just returned to work in March 2003 when she exacerbated an old injury to her back while bowling on June 15, 2003.  (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 164.)  In a disability report completed on August 28, 2003, Ms. Palmieri stated she was unable to work due to a spinal disc herniation, degenerative spinal changes, spondylolisthesis,[2] and spondylolysis.[3]  (Tr. 56.)  As a result of these conditions, she had difficulty going from a standing to a seated position or vice versa and was unable to sit, stand or walk for long periods, e.g., she could not sit for more than 15 minutes without severe pain.  (Id.)

    B.   Procedural Background

        On August 28, 2003, Ms. Palmieri protectively filed for disability insurance benefits, claiming that she had become disabled as of June 21, 2003.  (Tr. 45-48.)  Her application was denied on November 4, 2003 (Tr. 30-33), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on December 10, 2003.  (Tr. 34.)

        On September 2, 2004, a hearing was held before the Honorable

---

    [2]  Spondylolisthesis is the forward slippage of a vertebra on the vertebra below it, occurring usually between the fourth and fifth lumbar vertebrae. See www.nlm.nih.gov/medlineplus.

    [3]  Spondylolysis refers to disintegration or dissolution of a vertebra.  See www.nlm.nih.gov/medlineplus.

Janet G. Harner at which Plaintiff was represented by counsel. Judge Harner issued her decision on February 15, 2005, again denying benefits. (Tr. 14-21.) The Social Security Appeals Council declined to review the ALJ's decision on June 30, 2005, finding no error of law or abuse of discretion and concluding the decision was based on substantial evidence to support the ALJ's findings. (Tr. 4.) Therefore, the February 15, 2005, opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on September 5, 2005, seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g);

Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

4

## IV. LEGAL ANALYSIS

### A. The ALJ's Determination[4]

In determining whether a claimant is eligible for disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[5] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to DIB,[6] the ALJ conducts a formal five-step evaluation:

  (1)  if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

  (2)  if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not

_____

[4] As a threshold matter, the ALJ determined that Ms. Palmieri was insured for DIB through December 31, 2007. (Tr. 15.)

[5] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[6] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under either type of benefits.

disabled;

(3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)   if the claimant retains sufficient residual functional capacity ("RFC")[7] to perform his past relevant work, he is not disabled; and

(5)   if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[8] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Harner first concluded that Ms. Palmieri had not engaged in substantial gainful

---

[7]  Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[8]  Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

activity since her alleged onset date of June 21, 2003.  (Tr. 20.[9])
In resolving step two in Plaintiff's favor, the ALJ found that she
suffered from degenerative disc disease of the lumbar spine,
spondylolisthesis affecting the L5 vertebra, and lumbar
radiculopathy.[10]   She further concluded that these were "severe
impairments" as that term is defined by the Social Security
Administration.[11]   (Tr. 15.)

At step three, the ALJ concluded that none of Plaintiff's
impairments satisfied any of the criteria in the relevant Listings,
i.e., Listing 1.02 (major dysfunction of a joint(s) due to any
cause) or 1.04 (disorders of the spine.) (Tr. 15-16.)  At step
four, the ALJ concluded Ms. Palmieri could not perform her past
relevant work as an administrative secretary as it is generally
performed in the national economy. (Tr. 16-19.) However, relying
on the testimony of the vocational expert ("VE") at the hearing,

---

[9]   The ALJ refers to an onset date of July 23, 2003, at Tr. 14,
but the onset date of June 21, 2003, is properly noted in the summary
of her findings at Tr. 20.

[10]   "Radiculopathy" refers to any pathological condition of the
nerve roots.   See www.nlm.nih.gov/medlineplus.

[11]   See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b),
stating that a physical impairment is severe only if it significantly
limits the claimant's "ability to do basic work activities," i.e.,
"abilities and aptitudes necessary to do most jobs, including, for
example, walking, standing, sitting, lifting, pushing, pulling,
reaching, carrying or handling," as compared to "a slight abnormality"
which has such a minimal effect that it would not be expected to
interfere with the claimant's ability to work, regardless of his age,
education, or work experience.  Yuckert, 482 U.S. at 149-151.   The
claimant has the burden of showing that the impairment is severe.  Id.
at 146, n5.

Mr. Samuel Edelman, the ALJ concluded that although Ms. Palmieri could not perform the full range of sedentary work, a significant number of jobs existed in the national economy which she could perform, e.g., hand packer, telephone solicitor and ticket sales, all of which would allow for a sit/stand option to accommodate Ms. Palmieri's impairments.   (Tr. 19-20.)   Therefore, based on her status as a younger individual[12] with a high school education and some post-graduate courses, a work history of semi-skilled occupations, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Ms. Palmieri was not disabled and, consequently, not entitled to benefits.   (Tr. 20.)

B.   Plaintiff's Arguments

Plaintiff argues Judge Harner's decision was not based on substantial evidence because she failed to give controlling or at least deferential weight to the opinions of her treating physicians that she was not physically capable of full-time employment. According to Ms. Palmieri, "there is simply no basis" for the ALJ's improper rejection of the opinions of Dr. Frank Kunkel, a pain specialist who began treating Ms. Palmieri in September 2003, and Dr. Gordon Handelsman, her primary care physician.   She argues that not only were their opinions supported by the findings of Plaintiff's other physicians, no examining physician ever opined

---

[12]   Plaintiff was 37 years old at the time of the hearing, making her a "younger" person according to Social Security regulations.   20 C.F.R. § 404.1563(c).

that she was capable of engaging in full-time employment. (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 9, "Plf.'s Brief," at 13.)

Social Security regulations identify three general categories of acceptable medical sources: treating, non-treating, and non-examining.  20 C.F.R. § 404.1502.  Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a one-time consultative examiner.  Id.  Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records.  Id.

The Social Security regulations also carefully set out the manner in which medical opinions are to be evaluated.  20 C.F.R. § 404.1527.  In general, every medical opinion received is considered.  Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the

9

frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.)   20 C.F.R. § 404.1527; *see also* Fargnoli v. Halter, 247 F.3d 34, 43 (3d Cir. 2000), and Sykes, 228 F.3d at 266 n7.   The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record."   20 C.F.R. § 404.1527(d)(2).

In this case, Plaintiff was examined by a total of seven physicians between the time she exacerbated her back injury in June 2003 and June 2004.   Four of those offered either one-time or short term treatment or consultation.   Ms. Palmieri testified that a few days after she "felt her back pop" while bowling, she consulted with Dr. Edward Wrenn who, at the time, was in practice with Dr. Handelsman who had treated Ms. Palmieri in 2001 when she initially injured her back.   (Tr. 132, 121.)   On June 18, 2003, Dr. Wrenn noted that Ms. Palmieri walked "with a marked limp," and could not "really do heel or toe walk."   Straight leg raises caused vague discomfort in her leg, but mostly exacerbated the back pain. (Tr. 132.)   Ms. Palmieri followed up with Dr. Wrenn on July 3, 2003,

10

reporting that her back and leg pain were "somewhat worse." (Tr. 99.) She stated that she found it very difficult to sit more than ten minutes or to stand from a seated position. The pain radiated into her legs all the way to her feet, and was worse in her right leg. Flexeril and Percocet[13] "helped some." A straight leg raise test caused pain going down into her mid left leg and all the way to her foot on the right. Dr. Wrenn arranged for her to have an MRI scan of the lumbosacral spine and noted that she intended to follow-up with Dr. William Welch who had been recommended by a friend.[14] (Tr. 99.) Dr. Wrenn's impression was of "ongoing low back pain with radiculopathy with history of spondylosis."

The MRI was performed on July 8, 2003. The results showed an abnormal lumbar scan demonstrating "a central focal disc herniation of L4-5 without nerve root displacement; degenerative changes at L5-S1," and "adequate dimensions at all levels" in the canal,

---

[13] Percocet is a combination medicine containing narcotic analgesics and acetaminophen, used to relieve pain. Although such a combination may provide better pain relief than either medicine used alone, the body may develop a tolerance to the medication so that larger amounts are needed to relieve pain. Flexeril is a muscle relaxant used to relieve pain, stiffness, and discomfort caused by strains, sprains, or muscle injuries. Both drugs work on the central nervous system and may have negative side effects such as drowsiness or dizziness. See www.nlm.nih.gov/medlineplus/druginfo.

[14] Dr. Wrenn recommended that Ms. Palmieri follow up with Dr. John Levy, a spine orthopedist who had evaluated Plaintiff in July 2001 at the request of Dr. Handelsman. (Tr. 99, 121, 132.) Dr. Wrenn noted that Dr. Levy had recommended injections for pain, but Plaintiff had failed to pursue them and had stated as of January 30, 2003, that she was "pain free." (Tr. 132.) If Plaintiff followed up with Dr. Levy in July 2003 as recommended by Dr. Wrenn or in July 2001 as noted by Dr. Handelsman, none of his medical records are provided.

11

together with patent neural foramen at L3-4. (Tr. 135.)

Dr. Timothy Ward, an orthopedic surgeon, examined Ms. Palmieri on July 21, 2003, for further evaluation of her back pain. (Tr. 128.)  At that time, she reported no leg pain other than an "occasional tingling sensation in her right leg" and "occasional right buttock discomfort, but nothing significant."  Dr. Ward described Ms. Palmieri as "somewhat demonstrative," although straight leg raising was negative bilaterally and motor, sensory and reflex examinations in both lower extremities were "completely normal."  Dr. Ward advised Ms. Palmieri to "stay active, continue with therapy, . . . and try to get some weight off."  (Tr. 129.) Dr. Ward reviewed Plaintiff's x-rays, MRI from 2001, and a CT scan, concluding that "the disc bulge centrally at L4-5 is not really the culprit here," but rather that her back pain came diffusely from the three lower degenerative levels.  (Tr. 128-129.)

Dr. William Welch, chief of neurological surgery at the University of Pittsburgh Medical Center, examined Plaintiff on August 27, 2003.  In a letter to Dr. Handelsman of the same date, he noted that Plaintiff was able to perform lumbar movements well, and motor testing demonstrated "normal lower extremity muscular strength, bulk and tone."  The straight leg test was positive bilaterally at 30 degrees.  (Tr. 127.)  Like Dr. Ward, Dr. Welch examined the objective medical evidence, noting that x-rays done in February 2001 showed "good lumbar alignment" and an MRI done on

12

March 9, 2001, showed no stenosis. He described the July 8, 2003, MRI as showing "a small disc bulge at L3-4 with a moderate central disc rupture at L4-5 and a right L5-S1 disc rupture." (Tr. 127.)

Dr. Welch ordered an epidural steroid injection which was done at Presbyterian Hospital[15] on September 4, 2003. (Tr. 93.) He also recommended that Ms. Palmieri undertake a course of physical therapy. However, on October 9, 2003, after a second examination, Dr. Welch wrote to Dr. Handelsman that during two physical therapy sessions, Ms. Palmieri "experienced such severe pain that she had placed her own therapy on hold." (Tr. 125.) Dr. Welch reported that on physical examination, Ms. Palmieri was "in no acute distress," with antalgic gait and bilateral positive straight leg raises at approximately 30 degrees. (Id.) Dr. Welch recommended that Ms. Palmieri continue pain management, including epidural injections and physical therapy, with Dr. Frank Kunkel of the Pain Management Center in Cranberry, Pennsylvania. (Tr. 126.[16])

Dr. Donald Whiting from the Neurosurgery Group of Western Pennsylvania examined Plaintiff at Dr. Welch's request on January 6, 2004. His notes indicate that Ms. Palmieri reported she had

---

[15] Plaintiff refers to a September 4, 2003, MRI which "demonstrated 'unrelenting pain' and multiple herniated discs." (Plf.'s Brief at 16, citing Tr. 93.) The Court notes there is no evidence of an MRI being performed on that date. Moreover, the reference to 'unrelenting pain' comes from the statement of Plaintiff's medical history, not a medical determination.

[16] Dr. Welch examined Plaintiff again on March 3, 2004, noting only that her symptoms and physical examination were unchanged from October 2003. (Tr. 157.)

13

undergone "extensive physical therapy" which had failed to give her significant improvement.   However, there is no evidence in the record to show that she had undertaken any  physical therapy after her examination by Dr. Welch in October 2003, when she "placed her own therapy on hold."   (Tr. 111, 125.)   His description of Plaintiff's symptoms was similar to that of other physicians, i.e., "pain in the lower lumbar region and buttocks, with occasional tingling in the lower extremities, i.e., her posterior thighs and calves," and a "mild feeling of subjective lower extremity weakness at times," but without "significant lower extremity radicular pain." He noted she had "positive straight leg raising at about 25 degrees for low back pain, but no increase in her lower extremity radicular symptoms."   Dr. Whiting further commented that Ms. Palmieri demonstrated positive responses to three out of three Waddell's signs, that is, a marked increase in pain in response to a light touch, to minimal axial loading, and to rotation of the thorax and pelvis as a unit.[17]   (Tr. 111.)   Finally, he commented

---

[17]   "Waddell's signs" are a series of tests used to identify nonorganic causes of low back pain, i.e., non-specific tenderness, simulation, distraction, regional disturbances, and overreaction. These behavioral signs are consistently reliable and reproducible for identifying nonstructural problems in patients with back pain.   5 Attorneys' Textbook of Medicine, ¶ 15A.83 (Roscoe N. Gray and Louise J. Gordy, eds., 3d ed. 1999).   "While a positive test in one category is not considered conclusive, when three of the five categories are positive, there is a high probability of nonorganic pathology." Id. Superficial skin discomfort and tenderness on light palpation is an indicator inasmuch as physical back pain does not make the skin tender to light touch.   Axial loading refers to a test in which the physician presses down on the head of the standing patient, an action which should not cause back pain.   Similarly, rotation of the thorax and

14

that her MRI scans from March 2001 and July 2003 "actually looked quite similar with very little progression from one scan to the next." He concluded her back pain was "more typical of musculoskeletal pain rather than discogenic pain" and recommended she pursue a "conservative option" of following up with a psysiatrist rather than surgery. (Tr. 112.)

Finally, Dr. William F. Donaldson III examined Ms. Palmieri on March 24, 2004. Other than noting that she had "very little motion to forward bending, extension and lateral bending," his notes were consistent with those of other physicians, i.e., she had difficulty getting from a standing to sitting position and vice versa; she was able to heel and toe walk only with difficulty; her motor strength in her lower extremities was normal; and the range of motion of the hips and knees was benign. (Tr. 153-154.)

The ALJ accurately and completely summarized the notes of each of these physicians, describing the opinions of Drs. Ward, Whiting, and Wrenn as "compelling." (Tr. 17-18.) Consequently, she adopted

---

pelvis as a unit should not cause back pain since this action does not stress the back. Id. See Gordon Waddell et al., Nonorganic Physical Signs in Low-Back Pain, 5 Spine 117 (Mar.-Apr. 1980) and www:neuroland.com/spine, an on-line reference guide maintained by Charles Tuen, M.D., a neurologist at Methodist Medical Center, Dallas, Texas. See also Bazile v. Apfel, 113 F. Supp.2d 181, 187, n2 (D. Mass. 2000); Wick v. Barnhart, No. 04-35579, 2006 U.S. App. LEXIS 6493, *2-*3 and n2 (9th Cir. Mar. 10, 2006); and Hilmes v. Barnhart, No. 03-4262, 2004 U.S. App. LEXIS 18125, *16-*17 (7th Cir. Aug. 24, 2004), holding that when considered along with inconsistencies between the plaintiff's testimony and her medical records, positive Waddell signs sufficiently supported ALJ's inference that she exaggerated the extent of her disability.

a residual functional capacity restricting Plaintiff to less than the full range of sedentary work which would be consistent with their opinions, not with those of Drs. Handelsman and Kunkel.  She argues that the opinions of Drs. Wrenn, Whiting and Ward actually support the findings of her treating physicians and that the ALJ erred by dismissing their opinion that she was unable to perform regular full-time employment due to "excruciating physical conditions." (Plf.'s Brief at 19.)  We disagree.

ALJ noted that she declined to give "any significant weight" to Dr. Handelsman's unsubstantiated opinions for a number of reasons, namely: (1) there were no treatment notes to corroborate his opinion; (2) he last physically examined Ms. Palmieri in July 2001, more than three years before the hearing and the ALJ's decision; (3) Ms. Palmieri's testimony and pre-hearing submissions contradicted his statement of February 1, 2004, that she was unable to lift or carry "anything" and could not perform any postural functioning; and (4) he offered no explanation for imposing limitations on Plaintiff's upper extremities.  (Tr. 17.)

Plaintiff concedes that Dr. Handelsman had not physically examined her since July 2001, but argues that as her primary care physician, the fact that he followed her treatment by specialists whom he had recommended allowed him to know her condition and "to provide an opinion entitled to at least some level of deference rather than outright rejection."  (Plf.'s Brief at 17-18.)

16

We need not review Dr. Handelsman's notes in detail because the ALJ is correct in all her determinations.  Dr. Handelsman's letter of February 1, 2004, on which Plaintiff relies does little more than summarize the reports of Drs. Wrenn, Welch, and Ward. (Tr. 121-122.)  Although he refers to treatment he provided to Plaintiff between February and October 2001, the record does not contain contemporaneous treatment notes.

More importantly, Dr. Handelsman reported that although he had examined Ms. Palmieri as late as October 20, 2003, with regard to an unrelated problem, "[a]t no point did I do any type of comprehensive evaluation into the severity of pain, or impairments." (Tr. 121-122.)  At the same time, he noted in a form document entitled "Medical Source Statement of Ability to Perform Work-Related Physical Activities" that Ms. Palmieri was "unable to lift anything;" was "unable to work;" could only sit for 10-15 minutes without pain; was "unable to do any physical activity;" and could only stand ten minutes "before legs shake + terrible pain." (Tr. 123-124.[18])

The Court has been unable to identify any basis in the record for Dr. Handelsman's conclusion that Plaintiff was "unable to lift anything" other than her own statement in September 2003 to that effect.  (Tr. 71.)  No other physician noted any limitations on the

---

[18]   The Court assumes, based on the ALJ's analysis, this report was completed by Dr. Handelsman in February 2004 although it is undated and unsigned.

17

use of her upper extremities or that her back pain increased when she lifted or carried things. In fact, Dr. Kunkel described her motor and sensory functions in her upper extremities as being "grossly intact" (Tr. 148) and Dr. Whiting noted that the muscle strength reflexes of the biceps, brachioradialis, and triceps were "all +2 and symmetric." (Tr. 111-112.) Nor did any other physician note an inability to perform most postural functions except Dr. Donaldson's comment about Plaintiff's limited ability in forward bending, extension and lateral bending, a restriction the ALJ took into account in her hypothetical question to the Vocational Expert when she limited flexion of the lumbar spine to 45 degrees. (Tr. 181-182.)

Finally, we note that in the form completed by Dr. Handelsman, there are no "supportive medical findings" to substantiate his determinations. Instead, there are only conclusory statements, e.g., "[patient] unable to lift anything, unable to work," or "unable to do any physical activity." (Tr. 123-124.) Such statements do not comprise "substantial evidence" of disability. See Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993), holding that a form report where a physician simply checks a box or fills in a blank is, at best, "weak evidence" and where such a report is not accompanied by a thoroughly written analysis, its reliability is "suspect."

Thus, we conclude that contrary to Plaintiff's argument, the

18

ALJ did not err by placing greater reliance on the "more recent and convincing clinical findings" of Drs. Ward, Wrenn and Whiting rather than on the opinions of Dr. Handelsman. Assuming Dr. Handelsman could be considered a "treating source" although he had provided no direct treatment to Ms. Palmieri since 2001, his opinions are to be given "controlling weight" on questions of the nature and severity of her impairments only if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d); see also Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) ("An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.") As the ALJ properly pointed out, Dr. Handelsman's opinions in the February evaluation were not only inconsistent with those of more recent medical sources who were specialists in the disciplines relevant to Plaintiff's impairments, his conclusions were not supported by treatment notes or explanations of how he arrived at them.

Finally, Plaintiff contends that the ALJ erred by failing to give deferential, if not controlling, weight to the opinions of Dr. Kunkel. (Plf.'s Brief at 15.) Ms. Palmieri argues that Dr. Kunkel is "a pain specialist who has provided longstanding and frequent

19

treatment with consistent findings supported by the objective medical evidence." (Id.) She concludes that his opinions are based on "enormous familiarity with her conditions," and show that "she is physically incapable of full-time employment on a regular and continuing basis." (Id. at 19.)

As noted above, Dr. Welch suggested that Ms. Palmieri begin treating with Dr. Kunkel in August 2003. In his first examination on September 30, 2003, Dr. Kunkel noted Ms. Palmieri's reports of leg pain with walking, arthritis, weakness, numbness or tingling. (Tr. 146.) She described her lower back and leg pain as "severe, constant, shooting, and at times aching;" the pain was exacerbated by standing, sitting, walking, and getting up and down. On physical examination, Dr. Kunkel described her as being in mild distress, with a "very slow cautious gait, as if she is walking on pins and needles." (Tr. 147.) She had "strongly positive" bilateral straight leg raises. However, he noted he had "openly discussed" with Ms. Palmieri his concern that "she is showing some signs of symptom modification or that her pain is truly [worse than] one would believe it to be from her MRI." (Tr. 148.)

Plaintiff consulted again with Dr. Kunkel on November 18, 2003, complaining of radiating and tingling pain in her lower back and right lower leg and foot. She stated she was "approximately 50-70% improved on her current medical regimen" and was "able to do the activities of daily living better." She was in no apparent

distress, and although a straight leg raise was positive on the right and there was tenderness to palpation in the lower lumbar area and pain when flexing her trunk to the right and forward, heel and toe walking were intact.  (Tr. 142.)

On December 17, 2003, Ms. Palmieri reported that she continued to improve with her current medication. (Tr. 141.)  On physical examination, her gait was normal, but she demonstrated positive straight leg raise "at only 5 degrees with shaking of her right leg."  Dr. Kunkel stated,

> I am having a very difficult time figuring this case out. She has a straight leg raise that is dramatically positive at only 5 degrees. I have never seen one this positive. However, I do not know if this is consistent with the rest of my feeling on her pain syndrome and her MRI. I will follow Dr. Welch's lead here.

(Tr. 141.)

Between October 15, 2003, and January 25, 2004, Ms. Palmieri received a series of three lumbar epidural steroid injections at Dr. Kunkel's direction, followed on March 5, 2004, by right and left L3 and L4 lumbar paravertebral nerve blocks.  (Tr. 143-144, 139-140.) On February 22 and March 21, 2004, Ms. Palmieri reported that she continued to experience pain in her lower back, buttocks and legs, and demonstrated positive straight leg raises bilaterally.  (Tr. 137, 152.) By April 30, 2004, Dr. Kunkel noted that her functionality had increased since she began treating with him, e.g., she could stand for longer periods of time.  However, she reported pain on palpation of the lumbar spine with a "very

21

painful" range of motion in that area. Sitting down and getting up were also "very painful." She walked with an antalgic gait but did not use a cane. (Tr. 151.)

Plaintiff treated again with Dr. Kunkel on May 26, and June 21, 2004. (Tr. 149-150.) She testified at the hearing that as of June, her treatments by Dr. Kunkel had been reduced from once a month to once every three months since she was no longer receiving pain injections. (Tr. 167.)

On September 13, 2004, Dr. Kunkel wrote to Judge Harner on behalf of Ms. Palmieri. He stated that during the time he had been treating her, he found her "physical examination and presentation to be uniform and consistent." He believed she had "significant chronic pain" in her lower back and both legs which had been well documented by himself and her surgeons. (Tr. 155.) He stated, "At no point, I have ever seen Ms. Palmieri exaggerate any of her symptoms or show any signs of addiction or drug diversion." He offered his "full support in endorsing this patient for full disability." (Tr. 156.)

The ALJ declined to give significant weight to Dr. Kunkel's endorsement, primarily because she found that such a conclusion was "contrary to his own clinical observation, inconsistent with the balance of the medical evidence, . . . and otherwise a conclusion . . . reserved to the Commissioner of Social Security." (Tr. 18.) Judge Harner noted Dr. Kunkel had conceded in his letter that Ms.

22

Palmieri had a "limited capacity to work," although she would be dependent on "a substantial amount of pain medications." This conclusion is supported by treatment notes that as early as November 2003, after two lumbar epidural steroid injections and treatment with Percocet and Flexeril, Ms. Palmieri stated to Dr. Kunkel that she was "approximately 50-70% improved on her current medical regimen" and was "able to do the activities of daily living better." (Tr. 142.) In February 2004, Dr. Kunkel described her pain as "approximately 90% improved on her current medications." (Tr. 137.) In June 2004, although she continued to experience pain, she could "stand for longer periods" and was "tolerating not having an operation fairly well" (Tr. 149.) When taken into account with Dr. Kunkel's opinion that in September 2003, about three months after she injured her back, she was only in "mild distress" (Tr. 147), these consistent reports of decreased pain and improvement in her ability to stand and to carry out the activities of daily living contradict Plaintiff's claims of debilitating pain. We agree this is substantial evidence from which the ALJ could conclude that Plaintiff retained the residual functional capacity for sedentary work with a sit/stand option and no requirement for lumbar flexing.

Finally, the ALJ appropriately addressed Dr. Kunkel's opinion that Ms. Palmieri would not be able to work on a regular and continuing basis. The general rule is that the determination of

23

whether a claimant is disabled is a question reserved to the Commissioner of Social Security.   20 C.F.R. § 404.1527(e)(1).[19] However, while it is true that opinions on this question – even by treating sources – are not entitled to controlling weight or special significance, it does not mean that such opinions are to be rejected in their entirety. *See* "Medical Source Opinions on Issues Reserved to the Commissioner," Social Security Ruling ("SSR") 96-5p,[20] stating: "[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored."

Judge Harner did not ignore Dr. Kunkel's opinion on this question.   In fact, she addressed it at length in her decision, noting that his conclusion was inconsistent with his own clinical observations (e.g., that she showed gradual improvement after she

---

[19]   In full, this paragraph provides:   "We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."   20 C.F.R. § 404.1527(e)(1).

[20]   "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"   Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1).   "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."   Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

24

began pain management therapy and that she had no unmanageable side effects from her pain medication) and with the balance of the medical evidence (e.g., Dr. Whiting's conclusion that the MRI studies showed no significant deterioration between March 2001 when she was working full-time and July 2003 when she claimed to be disabled, and the fact that two of the specialists did not note abnormal straight leg raises.)  (Tr. 18.)

The Third Circuit Court of Appeals has held that "where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." Fargnoli, 247 F.3d at 42; see also Landeta v. Comm'r of Soc. Sec., No. 05-3506, 2006 U.S. App. LEXIS 20905, *14 (3d Cir. Aug. 14, 2006) (case law requires that the ALJ state the evidence considered which supports the result reached and indicate any evidence which was rejected.)  Here, Judge Harner explained which medical evidence in the record supported her conclusion that Ms. Palmieri was not disabled and why she was giving little weight to the opinions of Drs. Handelsman and Kunkel.

We conclude the ALJ's determination that Ms. Palmieri had sufficient residual functional capacity to perform a limited range of sedentary work was based on substantial medical evidence, all of which she thoroughly explained in her decision.  Plaintiff's motion for summary judgment in her favor must therefore be denied.

An appropriate order follows.

October 23, 2006

William L. Standish
United States District Judge

cc:  Gregory G. Paul
     Peirce Law Offices
     707 Grant Street
     2500 Gulf Tower
     Pittsburgh, PA 15219
     Email: gpaul@peircelaw.com

     Robert W. Gillikin, II
     Robert Peirce & Associates, P.C.
     707 Grant Street
     2500 Gulf Tower
     Pittsburgh, PA 15219
     Email: rgillikin@peircelaw.com

     Megan Farrell
     United States Attorney's Office
     700 Grant Street
     Suite 4000
     Pittsburgh, PA 15219
     Email: megan.farrell@usdoj.gov